Good morning, and may it please the Court. My name is Rebecca Klinkowski, and I represent Jefferson County Deputy Sheriff Eric Ebling in this appeal. There are three things that I want to talk about with the Court this morning. First, the complaint's complete lack of allegations that Deputy Ebling had the supervisory authority to unilaterally restrict Student One's movements, and that is fatal to Ms. Doe's claims, regardless of whether this Court analyzes them under its 1999 decision in Murrell or whether it recognizes that Iqbal abrogated that decision. Second, I want to talk about how Iqbal changed the legal landscape for these claims and changed the state of mind element that's at issue here. And third, I want to talk about Deputy Ebling's overarching entitlement to qualified immunity, because even if the Court is disinclined to recognize the manner in which Iqbal changed the legal landscape, and I would also note this Court's decision in Dodds v. Richardson affirmed that abrogation, at the very least, those decisions call into question the landscape for purposes of qualified immunity. The law can no longer be said to be clearly established. So let's talk about Deputy Ebling's supervisory authority, because that's really the heart of this case. And there are no allegations in the complaint that Deputy Ebling had supervisory authority over students, and that's in stark contrast to other defendants in this case. And in particular, we can look to the allegations against the Title IX coordinator at the school. We can look to the allegations against the assistant principal and the principal. All of those individuals, there are discrete, concrete allegations that they had authority to act. And again, that's fatal to Ms. Doe's claim, regardless of whether this Court recognizes the effect of Iqbal. Because it changed the legal landscape for supervisory liability claims. So, Ms. Doe and Deputy Ebling both acknowledge Deputy Ebling is a peace officer. And that role is defined in Colorado law. He's a school resource officer who has been assigned by his employer, the Jefferson County Sheriff's Office, to act in this capacity. And Colorado law, specifically CRS 22-32-146, speak to that role and the ability of law enforcement agencies to assign on-site peace officers to school. And I think it's also telling that CRS 24-31-312 speaks to the obligation of the employing law enforcement agency to provide specific training to SROs. And Ms. Doe acknowledges that she grounds Deputy Ebling's authority in his role as a peace officer. That's made clear in her briefing, and that would be the only source of his authority in this context. Why isn't that enough? The briefs take issue with whether there's a finding that Deputy Ebling was an employee of the school district, he's a peace officer, but isn't the requirement that he's acting under color of state law? So why does it matter whether he works for the school, works for the local sheriff's  Well, Your Honor, I think that this has to do with how he traces authority, right? If he is, as some states allow for, employed by the school, the school, as this court observed in Murrell, may have assigned him particular authority in this context to respond to these types of allegations. And again, that's an observation from Murrell, right? The court's not going to list out job titles. It really has to do with roles and the way that authority is assigned. But Ms. Doe, so there are no allegations in the complaint that that can be the source of Deputy Ebling's authority. There are no allegations that he has that authority. So we have to look to the other half that he wears in this context, which is his role as a peace officer. And in doing so, we have to overlie that the source of his authority and the bounds of his authority are the same as any other peace officer in the community. And in particular, that is constrained, most notably by Fourth Amendment principles, and in particular, the protection against Well, but why would we think about him like any other peace officer in the community? Because the amended complaint does talk in detail about his assignment to the school and he's acting under color of state law. And he was present at meetings where the family discussed these concerns, that he was part of a discussion of a safety plan. So he's not like a peace officer in the community. He's directly involved with the family here. So why should we think of him the way you just mentioned? Sure. So let's talk about that. He is directly involved in those discussions. But let's remember how all of this came into being. Ms. Doe makes her outcry about these prior sexual assaults that occur off campus during the summer, but she doesn't make it to Deputy Ebeling. So he's not in this privileged position of being the only individual with knowledge about her allegations. And when we get to this first meeting in January, the other people who are there are important. It's Ms. Doe, her mother, the assistant principal, the principal and Deputy Ebeling. And as alleged in the complaint, the point of that meeting is to come up with a safety plan. But the complaint alleges that no safety plan is ever created by the administration, by the district. That's not a role that is assigned to Deputy Ebeling, although we acknowledge that had such a safety plan been put into place, Deputy Ebeling certainly could have enforced it on school grounds. But he can't unilaterally restrict student one's movement throughout the school, which is what is alleged by Ms. Doe's complaint that he failed to respond reasonably. But again, we know that by the time Deputy Ebeling knows about Ms. Doe's allegations, the principal and assistant principal know actually prior to Deputy Ebeling, I think, if you look at the complaint and in the interim between the January meeting and the February meeting, the complaint alleges that Ms. Doe's allegations of continued harassment in the school to school administration, not to Deputy Ebeling. There's no allegation in the complaint that he knew between those two meetings that this was a continued to be an ongoing problem. And so even had a safety plan been in place, he wouldn't have had the knowledge to do anything under it. But we can also look at what he does do. So after the February meeting, the February meeting is when Ms. Doe alleges that Deputy Ebeling says, I will not restrict student one's movements in the school. I think fairly stated, he has no authority to do that. I don't think that the court can hold him liable for a constitutional violation that would require him to. He didn't say he didn't have authority. I mean, his statement actually implied he did have authority. He kind of said, I'm not going to do it now. As alleged in the complaint, your honor. Yes, that's what we have to deal with right now. That is what we have to deal with right now. But whether the court says that that implies that he does have authority or says this is just the use, the words that he used, we have to ground that authority in something. The obligation is to respond reasonably in the face of harassment. And and again, I think that implicates the Fourth Amendment. And we have to look to the totality of the circumstances here. So had Deputy Ebeling been the only person with knowledge of Ms. Doe's allegations, I think he would have been required to pass that information on to school officials. And maybe he would have been required to investigate. But that's not the facts of this case. In this case, what we have is Deputy Ebeling becomes aware of these concerns that Ms. Doe is voicing and the allegations from the summer after school administration. So telling school administration doesn't make sense. It's not a reasonable response. And he's also aware that that prior to his learning of these allegations, his own home agency, the sheriff's office, has opened up a criminal investigation about the same allegations that we're talking about here. And so it's also not reasonable to require Deputy Ebeling to investigate in tandem with his own home agency. But the complaint doesn't say he was investigating in tandem or actually it says that he was, quote, meddling in their investigation. Isn't the negative inference for that that he's getting involved in a criminal investigation he has no business being involved in? Which would underscore his lack of authority, Your Honor. Well, there's a difference between lack of authority to investigate the criminal aspect to this that the sheriff's office may be investigating, whether or not student one committed a crime in an authority of you're assigned to the school. And so you can take reasonable measures to ensure student one doesn't continue to harass Ms. Doe. Those are different levels of authority. They may be slightly different levels of authority, Your Honor, but I think we do have to focus on what Deputy Ebeling could have done. Right. So if if the ask, right, the I'm not going to unilaterally restrict student one's movements is, for example, changing schedules. That's not within his purview. Rerouting students through the school so that they don't come into contact with each other. And again, I think we have to get back to this idea that that Deputy Ebeling can't act unilaterally. He can enforce a judicial protective order once Ms. Doe gets one. And it appears either that he does that or that student one complies with that order because, as alleged in the complaint for the first time, Ms. Doe can access her education. But it's this ability to unilaterally do something right, which would have to be put through the framework of either reasonable suspicion or probable cause. Right. What is the trigger for a law enforcement officer to act even within the school context? And we know in other contexts that, you know, the Supreme Court has observed that students don't lose their constitutional rights at the schoolyard gate. Right. I think that's Tinker versus Des Moines. And that's true not just with First Amendment, which I think was the issue in Tinker, but it's also true with concepts like being free from unreasonable searches and seizures or being directed by a school resource officer as opposed to a school. You may be right on all of this, but why shouldn't we receive this argument more? It sounds like a summary judgment because we're looking at the amended complaint and taking all inferences and well-pleaded facts in the favor of Ms. And well, I guess let me ask it this way. Is your argument that she doesn't even plead facts on what levels of authority he had? And for that reason, you win? Yes, Your Honor. That is one of our arguments. OK, but there are inferences. Would you at least agree that she has made in the amended complaint about not just his presence at the meetings, but his deliberate indifference, as she's claimed, to not taking any actions and again, the fact that he's present, an inference could be that he does have some authority. Why isn't that right? Even if the court were to draw the inference that he has some authority, I don't think it's well fleshed out in the amended complaint that it is authority of the type that would be relevant to resolving this claim. And again, in light of the fact that school administration is aware and as alleged, did not put a safety plan into place. And then when they do later put a no contact order into place, again, allegation is that is effective, whether student one adheres to it or whether Deputy Edling has to then enforce it. And as is the judicially issued protective order. So he may have some level of authority, but it's not the authority necessary here. And the paucity of allegations against him in this context mean that you can't even get to that deliberate indifference threshold articulated in Murrow, which, again, I think it's very clear that Iqbal and Dodds abrogated that decision. Those are not limited holdings. When you look at them, there's no rationale for limiting them in the way that Ms. Doe would have this court do. And I see that I have just under two minutes. I'll reserve the rest of my time. Thank you. Good morning. May it please the court. We have had an extensive discussion about the nature of Deputy Edling's authority, and that is an appropriate discussion to have at the stage of summary judgment. It is not an appropriate discussion to have right now, as the court previously pointed out in its rulings from both the magistrate and the judge's ruling supporting the magistrate's ruling. The authority that Deputy Edling has is actually a question of fact, and that is something that could be fleshed out after the motion to dismiss has been ruled on, which it has been. And then we can discuss exactly what the extent of his authority is. Well, can you help me then? I think your opposing counsel points to statutory language that describes the officer's  Can we not look at that? Judge, I'm not aware of any statutory language that actually limits a school resource officer's, SRO's authority within the school. We have to understand that there certainly is a difference between the responsibilities of an SRO and just a regular cop. If the responsibilities of an SRO were tantamount to those of a regular cop, then anytime some kind of an issue came up, then you would just call the regular police. There would not even be the need for an SRO. But it's important to know how this SRO actually functioned within the building. The SRO was called in for the safety plan meeting. They didn't just call the Jefferson County Sheriff's Office and say, we need a cop here. We specifically need the SRO here, is what was argued. There's something else to the defendant, by the way. Let me let me ask, just following up on that. So are you alleging that Officer Ebling could write up a safety plan? Not that he could write up a safety plan, Your Honor. Isn't that what you have to allege? Well, but it's not that he's the only one writing it, but he is still part of the process. But did he have any authority to do it on his own? I don't know, Your Honor. So that's not normally the way that safety plans are done. When we are talking about a school safety plan, it is traditionally a collaborative process. You will have the student there, the student's parents, administration, a student advisor over there, and a police officer as well, or the SRO who is always brought in. There's an important thing here, I think, that the appellant touched upon as well, which he said, well, if he can, once there was a safety plan, then he could enforce it on school grounds. I don't understand this distinction. So it seems to be that the appellant is drawing a distinction between being involved in the drafting of a safety plan as opposed to the enforcement of the safety plan. Well, if he has any kind of authority with respect to the safety plan, then he is involved in those decisions at that point as to how to keep the child safe. Again, if the officer there says, well, once a safety plan has been developed, I'm going to ensure that I am one of the people who is enforcing it along with school officials. But at the same time, the reason they bring him in to the meeting to have the safety plan is because they wanted him, obviously, to have some kind of role in it. Otherwise, why bring him in at all? Well, I think I think opposing counsel is saying, yes, he was there to provide input. This is this is the situation or this is what I know, but could not actually make that safety plan happen. He was providing input, but he was not responsible for writing it. And there's no allegation that he could. Your Honor, where is the line at that point? If he's providing input, then at that point he is playing some kind of a role in the safety of the child. Also, if he has been tasked with enforcing the safety plan once it is written, then he has authority with respect to the power of the safety plan. Not when we have this collaborative process, there's really only one person writing a safety plan. Usually it's going to be an assistant principal or a student advisor. But if we take this argument to its logical extent, then that means that the only the person who is writing the safety plan is the person actually has the right to enforce it as well. But that's not the way that things actually transpired over here. In fact, Defendant Christie said, well, the safety plan will be written. And then if there are any kind of violations here, then you can go to me or you can go to this other person or you can even go to Officer Ebeling. The school was behaving as though he had this authority. Again, Your Honor, this is one of the reasons. Well, I think they're behaving as if he had enforcement authority. There were there was no statement. I guess I'm pressing you. Is there any statement that he had the ability to write the plan? They had the meeting. And was he supposed to write the plan? Again, Your Honor, I think we're getting into this distinction of who's writing the plan. An SRO, as far as I know, has never written a school safety plan that is written normally by school officials. OK, so you're conceding that. That he, which part, Your Honor? That he couldn't write the plan. That's not how it's done. Well, he could write the plan. It's not a practice. As we know, Your Honor, there are rules, there are policies, and then there are various practices. As a former school teacher myself, I've never seen an SRO actually sit down and write a safety plan. But it is routine for the SRO to actually be involved in the development of the safety plan, which this SRO was. That's why he was brought into the meeting in the first place and then tasked with enforcing as well. We can't point to anything that says, well, here's the law, here's the rule that says he's going to enforce the safety plan. But as the appellant had conceded, and as a point of practice as well, once that safety plan is in place, he can actually go ahead and enforce the safety plan. Well, I mean, he made statements, well, you can call me. I'll be one of the people you can contact. That's correct, Your Honor. And so the whole problem here is the prematurity of this. This is a motion to dismiss on the very bare-bone pleadings, which the rules say you don't have to plead facts and details. You just have to plead enough to get going. And so if you just barely plead enough to get going, then you're going to get dismissed because you haven't done what would be done at a summary judgment. And I'm just troubled. We don't know a lot of stuff here, and it might make a difference once we know this stuff. But we won't know it until we go to a summary judgment, it seems. And it just seems this is awfully premature to throw the case out right now. Judge, I completely agree with you. And I think this is why Judge Ida has been so effective in her interrogation of me, is that these are legitimate, factual questions that are being raised. And if we go through the entire discovery process, we go through the interrogatories, the depositions, and then we flesh out exactly what the extent of this officer's authority is, then the appellant can come back eight, nine months from now or whenever it is and make the same argument. At that point, we at least are functioning from the same set of facts. Right now, we all have questions about what is the extent of Officer Ebling's authority and what is not. And that's the problem, is we don't know. This is when we traditionally allow cases to actually move forward. Counsel, in your response brief, you wrote that as an SRO, Ebling had supervisory power and authority over students in CHS and the responsibility to respond to reports of harassment. Did you plead that and you made a complaint? I can't recall that, Your Honor. I'm sorry. I just don't remember. Well, I think another thing that we have to do, it seems like the appellant's argument is almost that the SRO Ebling can do virtually nothing, in which case my question is, well, why is he there at all? What is the point of having an SRO there? They are a school resource officer, ultimately to ensure the safety of children. So if he is there and he sees some kind of harassment or he suspects some kind of harassment, then he certainly has the right to step in. The thing is here, it would have been easy to step in as well. What was he asked to do here? He wasn't asked to go and arrest someone. He wasn't asked to go and detain someone. He was given a very simple ask, and that is, let's say that we have the victim over here and that we have the victimizer over here. Well, if they see one another, you simply tell the victimizer, you saw her go the other direction. That is it. If he does something just as simple as that, we're not here right now. This whole thing, by the way, there's an argument about the sheriff's office. And while he shouldn't step in because the Jefferson County Sheriff's Office was already investigating the sexual assault, that is a canard. Nobody is asking Detective Ebeling to actually involve himself in the investigation of the sexual assault. There was another investigator who was assigned to that and was doing that particular job. But the nature of sexual assault is complicated in the first place. And when we have students who are in the same building after a sexual assault has taken place, that increases that level of complexity because then you may have other issues. Sexual harassment, which took place here, possible witness intimidation, possible reoffending. That was Detective Ebeling's role is to prevent, to ensure that some of those things did not happen. So what we have here are really two different forums for who's responsible for what. The Jefferson County Sheriff's Office can go ahead and deal with the underlying sexual assault, which they investigated. And Detective Ebeling can go ahead and deal with the safety issue over at the school. Counsel, before you move on, and I'm moving away from facts totally. What do you think Iqbal did to Mural? And after Iqbal, what do you have to show in terms of intent? Do you have to show discriminatory intent? So I think that the Iqbal argument, as I understand it, that Appellant is making is a little bit odd because I think there really what we are talking about is a vicarious liability issue. Now, I'm not going to get into all of the particulars of what Iqbal did with respect to vicarious liability because vicarious liability is not at stake here. We are not trying to hold someone else accountable for the actions of Detective Ebeling. We are actually trying to hold Detective Ebeling accountable. And I don't think that the Iqbal case does anything when we are talking about direct liability rather than vicarious liability. So you just think Iqbal's inapplicable? I think in this particular case that Iqbal is inapplicable, again, because we're just talking about the direct liability issue. And you think Mural is 100 percent good law, not unchanged? It seems as though Mural continues to be good law. It has been law now for over 30 years. It has been cited repeatedly. And there's really no direct case on point that either Appellant cited or that we were able to find that said that the Iqbal decision would actually change any of the standards that are being used when we're talking about direct liability rather than vicarious liability. Thank you. Actually, Your Honor, I would, or Your Honors, I would like to reserve then three minutes for any kind of response, if I may. If I may not, then I can keep going. Keep going. OK. Going back to this issue, by the way, of authority, one thing that is important, I think Judge Federico, you pointed out to this as well, pointed this out as well. At no point was there any kind of allegation that he didn't have authority. He simply said he wouldn't do it. So at one point he was asked to basically step in and redirect the victimizer here in case there was a situation where he potentially could harm the victim again or harass the victim again or intimidate the victim again. He didn't say, well, I can't really do anything like that. He simply said he would not. Further, Detective Ebling was designated as one of the three adults the child could go to for future reports of sexual harassment. Now, the thing about this is that when, again, if we flesh this out during the summary judgment stage and we start looking at various facts, then we can actually ask Defendant Christie and other people in the building as well. OK, why did you specifically direct this student to go to Detective Ebling if there was some kind of an issue? Let's not only look at whatever the stated rules may be, but let's look also at your practices. Let's look at the general manner about which you went about these kinds of things. Also, the child, basically, they tried to take away her ability to go to others if there was some kind of a problem. Detective Defendant Christie had instructed the child not to speak to others except those designated. And again, Detective Ebling, or I'm sorry, Deputy Ebling was one of the people who was actually designated. Your Honor, you also asked me about the Iqbal case, and there was the Dodds case that was referenced during the appellant's presentation. And again, in the Dodds case, we were talking about holding supervisors liable for the actions of their subordinates. That's not at all what's going on with Ebling. I think what's happening here is that the appellant is conflating supervisory power and supervisory authority. If this was a situation where we were trying to hold Detective Ebling's supervisors liable for his actions, then I think that the Iqbal case, the Dodds case, both of them are fair game. We can have that conversation. But here, we're not talking about, we're instead talking about Detective Ebling's, or I'm sorry, Deputy Ebling's supervisory power. And that is a completely different issue. What are you trying to hold Ebling liable for here? What's the theory about what he is doing right now that would cause liability? Deliberate indifference. And that was the Morell case as well from 1992. Deliberate indifference to doing, what was he deliberately indifferent about doing? I'm sorry, I'm out of time here. But he was deliberately indifferent in terms of protecting a victim from sexual harassment after a sexual assault. What could he have done? What was alleged that he could have done? You were saying he wasn't an operative here at all. He could have stepped in. So in terms of any kind of harassment that took place after the alleged assault, he could have stepped in and actually redirected the student, kept him away from each other within the school building. But there wasn't an assault in that building in his presence where he could have stepped in. He wasn't even alleged to that. So you're giving him such limited authority that I don't see what he did that could give him liability. He doesn't have to, Your Honor. We're not dealing again with the sexual assault. But sometimes what happens with a lot of sexual assault victims, especially if they're seeing their victimizer day in and day out, is there's continued harassment and continued intimidation. And that's what the student or this child was experiencing. All right, thank you. Thank you. Thank you. I want to quickly address some of the things that opposing counsel brought up. First, there was a brief discussion about vicarious liability. There is no vicarious liability in the Section 1983 context. And I don't think that you can read Iqbal again as being so limited because what Iqbal starts off with, the court says, quote, here. We begin by taking note of the elements a plaintiff must plead to state a claim of unconstitutional discrimination against officials entitled to assert the defense of qualified immunity. Whether that is the actor in the first instance, whether that is on a theory of supervisory liability, this is not a limited ruling. And I also think it's important to look at Murrell's lineage. There's a lot of lineage going on in this case because we are dealing with, at this point, a series of decisions. But Murrell draws its authority from Woodward. Woodward is supervisory, a supervisory liability case. So is Murrell. There's no basis in the law to draw a distinction as between these theories of liability. And I also want to go, I also want to speak to the point that opposing counsel raised that that Deputy Ebeling could have intervened. But that, in the first instance, required that Deputy Ebeling knew of the harassment. So there are no allegations in the complaint that he knew of the harassment before the January meeting. And as opposing counsel acknowledged, it's not his job to draft the safety plan. He certainly could have had a role in enforcing it. But again, as the complaint alleges, no safety plan is implemented by the school. And so there is nothing for Deputy Ebeling to enforce. And opposing counsel said, I don't know what his responsibility would have been in the safety plan. And the reason that he, my apologies, I'm over time. Thank you very much. It's always an honor to appear before this court. All right, case is submitted. Counsel will be excused.